May it please the court. My name is Bernard Rhodes and I represent Tension Envelope, which was deprived of the opportunity to ask a jury to award actual and punitive damages against JBM Envelope Company, its CEO Marcus Xingcheng and its COO Daniel Pudov for their three-year long nefarious and illegal scheme to obtain what Mr. Pudov testified was first mover advantage, close quote, over Tension, its decade-long partner in supplying a very specialized type of envelope, which I happen to bring with me, an envelope for a company we call GSK, Glasgow Smith Kline, which sells a headache powder. If you're not from the South, you may not know what headache powder is. Headache powder is simply aspirin crushed up, put in this little special envelope. This actual envelope you see has says void on it because this is a pharmaceutical sold by a drug company. There are all kinds of requirements, including that scrap ones have to void. What you do is you take this, you chug it, and then you drink a Coke, and that will solve all of your headache problems if you live in the South. This company, Tension Envelope, has been in business for 130 years. We alleged in our complaint and the evidence showed that Tension had supplied this envelope to GSK, quote, for literally decades, close quote. It says literally decades because I couldn't find an employee at a 130-year-old company who had been there before Tension supplied this envelope to GSK. So it's been at least 40 years because they have lots of people there have been there 40 years. The same with these types. This is just an example, a very specialized envelope for agriculture research seeds. This isn't what you go find at Walmart to buy a watermelon seed. This is highly specialized, used by universities, used by seed companies when they do their genetic modification. It has to have very clear requirements. For example, it has to be absolutely dustproof because if a seed leaks out in field A, when the testing of this genetic modified is in field C, then the results are gone. The final is a company called Grace, which manufactures perfume sachets. Chemicals that smell, which go in here, requires, again, highly specialized, highly complex design. First of all, it's a chemical. It emits odor, so there's a chemical reaction going in. It can't melt. It can't eat through. It can't make the ink rub. It can't get off because my grandmother would put this in her underwear drawer and she doesn't want all the chemicals in there. So these are highly complex products that Tension had made for years. These products were GSK and Midco. Then JBM comes along, promises to everybody, not just us. It's on their website. They tell it to everybody. We only sell to the trade. We don't sell direct to customers. You can trust us because we only sell to the trade. Yeah, but you can trust us only in so far as we refuse to sign a non-compete, right? No. So wouldn't that be a flag that you can't trust? Absolutely not, Your Honor, and here's why. Because when the tables are turned, Greg Ching Shang, Marcus's father, asked Tension to sign a non-compete. We said, no, thanks. He said in his deposition, okay, fine. I understand you want to do that. Not a bit of problem. I still trust you. I still keep giving business to you. And then said, when Tension didn't sign it, did you think that they would go behind your back? He said, absolutely not. But doesn't that totally undercut your requirements contract argument? Both sides said, we know there's no non-compete and you're both free to do whatever you want to do. The first part is true. The last part is absolutely not true. Because, in fact, you did take work away from JPM. No, not for the big three. Well, but for others. For others. But the testimony is, this is summary judgment. Yeah, but you want to have a requirements contract that are sort of requirements and sort of isn't. No, I don't. I want to have one requirements contract for the big three and everything else is everything else. And that's the testimony. That is the testimony. That may be what you want. No, that's the testimony. And this is summary judgment. I'm entitled to the benefit of that testimony. I'm entitled to reasonable inferences from that testimony. Is that a minor technical point? Would you lower the lectern? So what's your best? Very powerful voice. And it's overpowering us. OK, yes. So what's your best? What's your best theory? My best theory is fraud. That in 2011, when Marcus and Dan Rudolph took over, they concocted a scheme. They admitted that in their depositions that it was in 2011. This is the testimony of Daniel Rudolph. As soon as we said we wanted to get closer to the end user, tension was in play. When did you reach that strategy? I believe that was 2011. Then he's asked, your strategy was to, and I'm sorry, that first one is the appendix page 996. Then he's asked on 990, your strategy was to eliminate people like Sinveo and Tension. Our strategy was to work more directly with the end users. And in the process, eliminate people like Sinveo and Tension. Eliminate them as customers? Question? Yes. To stop doing business with them. So they had this plan. They knew this plan. They formally adopted this plan in 2011. It's not a matter of if, it's a matter of when. So they adopted in 2011 and then they lie and they lie and they lie to us to keep us in the fold until they're ready to spring their trap. They have to get more equipment. They have to get things ready. So they have to do a test run with this company called Sinveo, which they say was great. We learned a lot. We now are much better at how to steal the customers. And this is not just my thought that what they're doing is wrong. This is what Marcus Ching Cheng said in his own memo when he talks about, once we do this, we're going to burn the boats on the beaches. What was the false statement? Was it that we don't sell to end users? The false statement, well, as to the non-disclosure, the false statement is this continued impression that we're your partner, that we don't sell to end users. We only sell to the trade when they knew that was false. But the on the fraud, affirmative fraud, they're not currently selling to end users. That's not a false statement. It is a false statement if they don't intend to keep that. And that's the law in Missouri. Oh, come on. No, no, no, no, no. Judge, with all due respect, if I know that I'm going to go over my time and I say to you, I'm not going to go over my time and I have a script right here, which shows exactly how I'm going over my time, I'm lying to you. I'm lying to you. And that's what we have. They admitted that their plan was created and adopted in 2011 for the very purpose of eliminating them. In 2014, when Marcus's father said this is unethical, he said this is the plan we've been doing for years. False representations that we don't intend. No, the false rep is the actual affirmative false representations. In 2012, Marcus Xing said, we'll be a good partner for you because we only sell direct to the trade. And that's puffery. We'll be a good. We only sell direct to the trade. That's not puffery. Well, isn't that true at the time? It was not his intent at the time. Isn't there a difference? No. You have a case that says that? Yes. We cited numerous cases, Your Honor. But under Missouri law, a promise coupled with an intent not to not to comply with the promise is fraud. And that would be if if they said we will never sell or we don't ever intend to sell. Going forward, I can see where you would have a point if they say we don't sell currently. They said we don't sell and we won't sell and we will never sell. Oh, OK. Now, that may be a little different. That's that's what the evidence is. Bob Broadbear. We don't sell. We won't sell. That's why you can trust us with this business. You read the district court's opinion. He acts as if this was a court tried case. He doesn't give us the benefit of any inference. In fact, the court itself found that this plan was adopted in 2011. The court finds that in its ruling. Yet nevertheless, it granted summary judgment. This is actually from the court's quote. In late 2010 or early 2011, J.B.M. created a strategic plan. One focus of the plan was to develop up, develop meaningful end user relationships and to eliminate companies like Tension. Dan Putoff testified J.B.M. did not tell Tension about their plan because they wanted to gain a competitive advantage. So the district court found that they adopted this plan in 2011. They intentionally didn't tell us about it because they wanted to gain advantage while they continue to assure us that we're your partner. There's nothing that we need to change. This is exactly the relationship we want. All the while, they knew they were lying through their teeth. At the same time, Tension knew they wouldn't sign a non-compete agreement, just like Tension didn't sign a non-compete for J.B.M. and J.B.M. said that's fine. But there was a second. They were obviously concerned because there was a second request. Yeah. They wouldn't sign it the second time. And the second request was specifically because we were beginning to think maybe they're maybe they're not being truthful to us. So we called them to Kansas City. We specifically asked them. We said, is there anything we can do to help this relationship? Their answer was sell more envelopes for us to make. That was a lie. That was not what they wanted. They'd already made their plan to go elsewhere. They lied to us. They led on the false impression, which under Missouri law is clearly actionable. But weren't you also making noises that you might move some of the business over to China? No, not as to the big three. That's the distinction the district court missed. Understand that all this other stuff is, quite frankly, junk. It's less than 10 percent of the total business. It's junk. This is the big why. Why wouldn't your junk be the precursor to moving the big business over just as their testing of the little market was the precursor to them going directly to then users? I mean, boy, if I were if I were JPL, I'd be pretty darn concerned if you're starting to move the junk over that pretty soon the rest of us going to follow. Well, they could have asked us to negotiate the noncompete if they wanted protections. They never did that because that was not their interest. They wanted out. They had to. They were three years into their plan to get out. They did ask you to negotiate the first noncompete. And we attempted to negotiate and we were unsuccessful, just like when they asked us to sign a noncompete and we didn't sign and we didn't take the business elsewhere. I've saved saving my remaining time for rebuttal. Yes, your honor. You with respect to the requirements contract. Yes. You concede that that involves a sale of goods more than 500. Yes, your honor. What's your best writing to get my best writing is is is actually two documents that relate directly to this question about is this junk or is this the big three? Not only did JBM represent to us that they were our partner, that this is how the relationship worked. They represented a friendly to our customers. So we have a writing sent to GSK signed by signed by on the stationery of JBM and tension in which they affirmatively represent. We have a long established relationship of trust and we're partners and we supply this product to you in questioning by GSK. Well, why can't we just buy it straight from JBM? The answer was we don't sell to end users. Similarly, on Medco, there's an email. I believe it's a memo, excuse me, from Marcus Ching Cheng to JBM again, expressly referring to Medco as the partnership, which is the testimony of broad broad broad broad bear as to what he and layman terms referred to as their requirements contract for the big three. So those are the two documents that we have. Mr. Wayne, good morning. You may proceed. Good morning, Your Honor. May it please the court. My name is Richard Wayne. I represent the appellees in this case. As you can see, tensions approach in this matter is to attack the analysis of the district court. And they also attack the appellees for change, deciding to change their business model. I think you hit the nail on the head. There was not a non-compete. They had the ability to sell direct. There was no prohibition on selling direct. And that's one of the problems with with with tensions argument. They don't come to terms with the consequences of not having a non-compete. They don't. Does there necessarily have to be a written non-compete? Absolutely. Yes. In this context, absolutely. And there is not one. They tried to get them to do it and they would not sign it. They refused to sign it. They worked under a for some period of time. That was a limited use lease. Oh, I'm sorry, Your Honor. I'm sorry. You can actually raise that. My voice is not as bad. Maybe that's the way you do it. So they did. So they fail to identify any evidence that prohibited J.B.M. from changing their business model. And when you when he talks about what the court has done, when you look at the requirements contract, couldn't there be an oral non-compete? Could there be an oral non-compete? There could not be an oral non-compete. You have to have that document in writing. And here it's clear the record. It's so uncontroverted here. They made three attempts to get J.B.M. to sign the non-compete. And on all three occasions, J.B.M. said no. It was in October. It was in May and June of 2006. It was in October of 2006. And it was again in May of 2014 when they came to them and tried to trick them into signing a non-compete. But they refused on all three occasions to sign it. In terms of their first claim in the requirements contract, they try to make it out as we were the exclusive, with a ledge, that we're the exclusive manufacturer for open-end envelopes for the three customers, GSK, Grace, and for Midco. In applying the governing case law, the district court determined that the question that the court had to grapple with to determine whether there was a requirements contract and whether it existed is whether there was legal consideration. And in this case, in applying the law to the uncontroverted facts in this case, the evidence is not in dispute. All the sales were on a purchase order-to-purchase order basis. There was no larger requirements contract. Tension was not legally obligated to buy from J.B.M. and J.B.M. was not legally obligated to make the envelopes and sell them to Tension. In fact, there's some testimony from Broadbear that he was agreed to give this business to Tension. The problem with this argument is, in his testimony, is there was no legal obligation, and without the legal consideration, the court said that there was a lack of consideration, and we believe it was appropriate to grant some adjustment. What about this partnership document? There's no partnership documents. Those documents that were some memos back in 2006 that said they were when they started working together in selling this stuff. You know, research and development said a vendor is a partner in our business. These guys were vendors. The guy that ran these divisions, the GSK division and the Midco account, his name was Dave Williams. There's a declaration in the record that said they were not partners. They were supplier of these products. There is no evidence that controverts that testimony in the record at all. And these guys were, they were suppliers, and that's what J.B.M. was, it was standard operating procedure to get the supplier to sign a non-compete. They didn't do that here, and that's testimony in the record. That's also in paragraph 102 of the First Amendment complaint, which is AP35, that there is a reference there that when you have a supplier and they are selling for you, you have to get them to sign a non-compete. So the testimony also, I should say, of Tom Brackman, the director of purchasing for them, also testified that it was standard operating procedure to have a non-compete. So there's no excuse. They can't get away from the fact that they didn't have a non-compete or a confidentiality agreement, and there was no prohibition upon these guys from selling direct if they decided to. All right, how about fraud, though? What if they represented, as counsel says they did, that we don't intend to, we never intend to sell to end-users when they're in fact planning to sell to end-users at that point in time? Isn't that sufficient to state a fraud case? Yeah, but that would be, but that's not what happened here. If you look at what is in the record, the first alleged fraud was a fraudulent misrepresentation, was a statement in March of 2012. Marcus Shinshang said that J.B.M. does not sell to customers' customers at that time. The court reviewed the record and concluded that tension failed to show that the statement was intentionally false. Remember, that was done in March of 2012. They didn't, and the court pointed out that it may be true that J.B.M. adopted a plan, but they didn't implement that plan for over two years later. So at the time he made the statement, he was a good partner. He didn't sell to customers' customers. It wasn't until two years later in May of 2014 when J.B.M. was being pressured by tension. Business was being taken away. They threatened to move the G.A.S.K. business elsewhere, and when that happened, these guys decided that they needed to do something, and that's when they decided to go ahead and sell direct. But up until that time... Well, I think one of the arguments that tension makes, however, is that that's a disputed fact. When they actually decided to implement the plan is a matter of factual dispute and that the district court impermissibly granted summary judgment on that issue. Your Honor, if you look at the uncontroverted evidence, it is perfectly clear the documents that he relies on are Board of Advisor minutes and memos. They formed this committee in 2010 because they were concerned they had to write off a big account receivable. They were worried about their future. You look at all of the documents from the beginning in time. They did talk about going direct, but they talked about going direct with paper cuts, glassine, and retail seed packets. They did talk about going direct with these other packets at some point, but no decision was made, and clearly the documents unrefuted in the other issues. We're only going to go direct with the paper cups, the glassine, and the retail seeds. They didn't decide to do that until June of 2014. So to say that it's not unrefuted is absolutely incorrect. If you look at the documents in the record, it's absolutely crystal clear, unrefuted, that they weren't going to do anything in these other areas until 2014. Whose documents? Excuse me? Whose documents? JBM's documents. They had a Board of Advisors during that period of time, and if you look at the activity during that entire period of time from 2010 until June of 2014, they absolutely did nothing but sell the envelopes. Detention intentions sold them. It was when they were pressed in June of 2014, May and June of 2014, that's when they decided to sell direct. There was absolutely no prohibition on that, and the court made it very clear the fact that there was no non-compete, there was no confidentiality agreement, that JBM had the authority to be able to do that. What about the June 13th statement that your president admits was a false statement? Which statement? He says he was asked about his intentions, and he admits in his deposition that he falsely represented that he would copy Mr. Thompson on all communications. That the Grace matter. And he admitted he had no intention of following through on that. Because at that point in time... It already decided. Well, it was the day they decided. It was the day they were talking to Grace that day, and that was dealt with by the court, the district court, and the court said, looking at that particular statement, the court said that even if it wasn't a representation, first of all, the court said it wasn't a representation, it said even if it was a representation, based upon the problems that they were having, their memos in the file at attention starting in November of 2013 concerned about JBM selling direct. They're telling the management about that, and they're concerned about it, and the court, looking at that, said you couldn't rely upon that statement if it was a statement. They didn't show that they had the right to rely upon that statement, and they didn't show how they were possibly damaged as a result of that particular statement. So I don't think, I think the court was absolutely correct on all three of the statements. The other fraud claim in the case is the fraud by non-disclosure, and that's this issue that claims that raised the question of fact as to whether or not JBM had a duty to tell tension about their change in their business model in advance of changing it. Let me interrupt by asking, when did JBM conclusively decide to sell to end users? The end users being the GSK, Grace, and Midco was June 13th of 2014. What's the evidence? I'm sorry, it's May. May, excuse me. It's May 13th. I'm sorry. What's, you said, and your opponent disagreed, that there was ever any threats of taking business away from JBM as to the big three. But you said there was, there were threats. Broadbeer threatened in January of 2017. There was a declaration. 2014? 2014. Broadbeer said that in January of 2014, we're moving business. He also said. Well, let me ask you specifically, what did he say? And where's the record? What's the record show about what he said? There's a January 17th, 2014 email from Broadbeer talking about not bringing new opportunities to JBM, business being moved away from JBM. There is also a declaration in the record from Dave Williams that goes through Midco and moving some of their manufacturing to China in terms of theirs as well. So there are records throughout that I've referred to in our brief that deal with that. But those are the most important ones is the January 17th, 2014 memo. On this issue of whether there was a duty to disclose, the district court looked at the record and found that this case was very similar to the lakeside feeders case and held that JBM intention conducted business on a purchase order to purchase order basis. There was no non-compete prohibiting them from going direct. There was no fiduciary relationship. There was no inequality in the companies. And therefore, the court concluded that JBM did not have a duty to disclose that they were going to change their business model before they did it. There was no agreement. There was no provision that required them to do that. They also have a claim for tortious interference. And that is that they claim that JBM made false representation of facts, the tensions customers in this constituted improper means. Tensions claims based solely on a memo in the record of a company called the Mooney Group that JBM had hired as a PR firm to help them. The district court indicate the question that it had to decide was whether the justified the court looked at the the Mooney memo and also looked at declarations that were put in from GSK and from Grace in the statements in the strategy that was referred to in that Mooney memo, as well as the testimony, Mr. Putoff, that they didn't use any of that information in terms of talking to and talking to the people at GSK and Grace. So the allegations that they made that there were false statements were absolutely untrue and they're totally refuted without any contravention from tension on that particular issue. Can we talk about the trade secrets claim? That was dismissed. Yes. And so and it wasn't repled. So I understand you've got a waiver. The court did say, if you're going to file an amended complaint, you do it in accordance with our directives, in accordance with the court's directives, which meant that case was dismissed. We have a couple of cases that suggest that the failure then to refile that is not considered a waiver. We believe we have cases that we don't have them right off the top of my they're in our brief that we believe that they waived that by not refiling it because the court had said you need to put in if you're going to replete, you need to put in the information. But when it's when it's potentially sanctionable, we have the Atlas and the SAP case, both of which say you don't have to do it if it's potentially sanctionable. And when the court says, in accordance with my directions, that's potentially sanctionable. Correct. Let's assume I disagree with your waiver argument. OK, on the merits, how do you how do you win? Well, on the merits of the issue is whether or not the identity of those customers and whether or not their requirements are trade secrets. Was it just the identity of the customers or is it the specifics of how these envelopes are made? It's the identity and the requirements. It's both. Excuse me, but it's the identity and the requirements. OK. OK. And the court indicated that they are not trade secrets under the Missouri Trade Secrets Act. It also said they're not trade secrets if they even if they are trade secrets, that tension didn't do anything to protect those and said that that information, the names and the requirements are could be trade secrets of the customer. And that's where that's where JBM got the information from the customer. And that's not properly alleged. And that's why we believe that decision should be affirmed in terms of the dismissal of that claim. Once more, very quickly, back to the fraud claim. Suppose we say that there was a question of fact, the statement we don't sell, we won't sell and we will never sell to direct customers was false and they were knowingly false at the time it was made. Let's see. There are about nine separate requirements under the Missouri law on fraudulent representation. Right. It was clear that if that's a question of fact, where else wouldn't that be a tribal case for a jury? No, I don't think so. In this case, when you look at the facts of this case, because at the time those statements were made, it was years before anything was put in place that could be a question of fact. But back to the question that there was reliance, they suffered reliance. Assuming they had a fraud claim, they could prove the reliance detriment. Can't they? Couldn't they? I don't think they can prove the reliance claim reliance element in this case because they took no actions. They had no expenses beyond the sales. What they did here, they traded their short term profits for their protection in the long term by not having the non-compete in terms of what you have to look at in terms of the fraud claim is what was the intent at the time, at the at the time the statements were made, the people at JBM fully believed and were going to continue to sell to tension. It wasn't until 2000 in May of 2014 when that decision was made to change. What was your motive in hiring the public relations firm? They were worried about what was going on with tension. Tension was putting pressure told them they had a non-compete. They didn't have a non-compete, told them they were moving business to other places. They were worried that there was a woman's name and Mooney, Miss Mooney, Jennifer Mooney. She's trying to characterize her as a lady, Macbeth or Bengali or both. Well, that's what we did. Very good at what she was doing. Well, that's what we did our investigation because we wanted to find out whether the allegations that were made by tension were actually said to grace and GSK. And without fail, they said, no, they weren't made. But to hire somebody, you know, you'd be a straitjacket if you couldn't, if a company didn't didn't have the ability to hire somebody to help them through various processes. One more thing. I can't I can't resist this. I should, but I won't. Who was the father? What was the father's name? Greg, Greg Chen Chang. That was happening was would be dishonest. Excuse me. Didn't he testify that what he what was being done was dishonest? No, no. He had raised some questions with his son in February about 2014, about the problems they were having. Didn't he use the word honesty versus dishonesty? He used a number of words there, but he was but it wasn't my comp. My thought when I read that was that what's the son's name? Marcus. Maybe this is an example of where the apple fell too far from the tree. Well, I don't think that if you look at it, your honor, and with all due respect, I don't think that in this context that these guys did anything wrong. The problem was there was no non-compete in these guys. We've heard that a few times. In fact, yeah, and I think that brief said that this is where this was. And I don't mean any disrespect to the district court when I say that was sort of the mantra that the district court followed. But anyway, thank you for your argument. Your honor, Mr. Wayne is incorrect when he says that non-compete has to be in writing. That's not covered by the UCC. And the testimony was unequivocal that the promise has been repeatedly made. We don't, we won't, and we will never sell direct to your customers. That is effectively a non-compete. The discussion of, well, how did we rely upon this downright admitted lie at the meeting with Mr. Thompson, which is right before Mr. Xing Sheng and Mr. Pudov got on the plane to go to Grace to tell him we're stealing you as a customer. There is this literal Keystone Cops episode in which Mr. Xing Sheng and Mr. Pudov happen to accidentally run into the attention salesman for Grace in the airport. And they're on these people movers crossing each other. I mean, you could, it's like out of the vacation movies. And Mr. I asked Mr. Pudov, so did you invite the sales rep to come with you? Well, no. Why? It was none of his business. Why? Because he didn't need to know what we were doing. Why? Because I wanted to get first mover advantage. I wanted to tell my story first. I wanted to be the appellant and go first. I wanted to use Ms. Mooney's script, which he unequivocally testified he used that script in which he said, tell them that tension lied to you. That'll convince them to dump tension and go to you. That's the reliance. That was why this whole scheme was so important. That's why Marcus says, and this is not my testimony. This is what he says. When people find out what happens, this will be burned the boat on the beaches because no one will trust us. That's about all the evidence you need to know that they had fraudulent intent. Thank you, Gerardo. Well, the case is submitted. We will take it under consideration.